**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA :

      v.              :             **26-MJ-040**

GERALD EDDIE BROWN, JR.   :

**DEFENDANT'S OPPOSITION**
**TO GOVERNMENT'S MOTION FOR PRETRIAL DETENTION**

Pending before this Honorable Court is the government's request to detain Mr. Gerald Eddie Brown, Jr., pretrial, pursuant to 18 U.S.C. § 3142. Mr. Brown is 65 years old and has no prior convictions. Contrary to the government's claims, Mr. Brown is not a flight risk—and, to date, he has complied with at least two requests to meet with and be interviewed by law enforcement. He believes firmly in his innocence and has every incentive to show up and continue to show up to court to vindicate himself.

Based on Mr. Brown's lack of prior convictions, his family ties to the United States, his cooperation with law enforcement, his incentives to clear his name, and additional reasons set forth below, the Court should release Mr. Brown to return to his apartment in Indiana, seize his passport (as the government has already done), impose a condition that forbids him from contacting any consulate—whether in-person or electronically—and ask the government to place him on the "no fly" list if they have not already done so. That is more than necessary to ensure his appearance. And, if that does not provide enough assurance to the Court, Mr. Brown requests that he be placed on home detention or ordered to live with his sister Terri Brown as his third-party custodian in Minnesota.

### Background

Mr. Brown is a 65-year-old Air Force veteran.  He served starting in 1983 and retired from active duty in 1996.  During his time in the service, he served two combat tours in Iraq and received numerous medals and commendations.

Following his retirement from the Air Force, he became a commercial pilot, working for the United Parcel Service (UPS) for over a decade before taking various jobs in commercial and private aviation.

On February 25, 2026, Mr. Brown was arrested for violating and conspiring to violate the Arms Export Control Act (AECA), in violation of 18 U.S.C. § 371 and 22 U.S.C. § 2778. *See* Affidavit in Support of Complaint (Dkt. 1) ("Affidavit").  In particular, the government alleges that Mr. Brown provided fighter aircraft training for the People's Republic of China's military, including for pilots in the People's Liberation Army Air Force.  According to the government, this training constituted a defense service under the International Traffic in Arms Regulations and required registration with and a license from DDTC prior to being provided to foreign persons. Mr. Brown vehemently denies those allegations and looks forward to clearing his name.

### Argument

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). The Supreme Court has explained:  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987);

*see also United States v. Singleton*, 182 FDA 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). Generally, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Here, the government has requested pretrial detention pursuant to 18 U.S.C. § 3142(f)(2)(a), which provides for detention "in a case that involves . . . a serious risk that [the defendant] will flee." In order to hold Mr. Brown without bond pursuant to this provision, it is not enough for the government to prove by a preponderance of the evidence that Mr. Brown is a flight risk. The government "must prove by a preponderance of the evidence that the defendant poses a '*serious*' flight risk." *See United States v. Jamal*, 285 F.Supp.2d 1221, 1228 (D.Az. 2003) (emphasis added) (quoting 18 U.S.C. § 3142(f)(2)(A)). Moreover, the "[m]ere opportunity for flight is not sufficient grounds for pretrial detention." *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The Bail Reform Act authorizes detention "only upon proof of a likelihood of flight." *Id.* at 160. The "preponderance must, of course, go to the ultimate issue: that no combination or conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can 'reasonably' assure that the defendant will appear for trial." *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The government cannot meet that burden here.

## A. The Government Cannot Meet its Burden to Show Mr. Brown is A Serious Risk of Flight

The thrust of the Government's motion is that it believes Mr. Brown has no material ties to the United States, has ties to China, and will flee to China. It is wrong on all counts. He has

every incentive to clear his name, and, if released, will remain in the United States—where he has retired—to do so.

   1.  *Mr. Brown's substantial ties to the United States*

To begin with, Mr. Brown is a U.S. Air Force veteran with a decorated record of more than a decade of military service.  He has fought and risked his life for the United States of America, the country he loves and calls home.  Through his admirable military service, he learned the critical importance of following orders.  He is committed, just as he was decades ago when he was in the service, to follow each and every directive of the Court's, no matter how uncomfortable or onerous.

In addition to his loyalty to this country, as demonstrated by his military service, Mr. Brown has substantial ties, including familial ties, to the United States.  He has two beloved sisters: Terri Brown, who lives in Minnesota, and Sheryl Champlin, who lives in Texas.  Both are law abiding, upstanding citizens, and both are accountants.  Terri works part time.  Sheryl is retired. Since defense counsel made contact with both sisters, they have been in daily (and at times hourly) communication with her about their concerns for their brother's health and safety while incarcerated.  Both are desperate for him to get out, and both have offered to have him live with them.[1]  Indeed, as Sheryl herself told defense counsel, she lost her twin sister years ago, and "will not lose another sibling."  In other words, Mr. Brown has a robust support system in the United States.  By contrast, he has no familial ties abroad.

The government's detention memo makes much of Mr. Brown's estrangement from his ex-wife, with whom he had an acrimonious divorce.  But having a poor relationship with an ex-spouse does not make someone a flight risk.  That acrimonious divorce has also, unfortunately, led to

---

[1] The government quotes from an interview with Mr. Brown that he has no family.  Mr. Brown meant he did not have family in Indiana where he lived. His sisters, as noted, lived in other states.

estrangement from his daughter. But Mr. Brown is desperate to reunite with his daughter, who is a 15-year-old minor and for whom he recently bought a car.[2] The fact that he did not immediately reach out to her upon his return should not give pause to this Court about his flight risk. As the government notes, he is making improvements to his home, and it is not ready for his daughter to stay in.[3] Mr. Brown is also aware that he needs legal assistance in order to regain custody of his daughter. Rather than, immediately upon his return, showing up and dragging his daughter into another tumultuous and potentially traumatic interaction with his ex, he was taking steps to get his life in order first when he was arrested. Mr. Brown also has an adult son who is living his own life but whom Mr. Brown loves dearly. Mr. Brown understands that if he were to flee, he would likely never see his children again. Their presence in the country is all the more reason for him to stay here.

### 2. Mr. Brown's Additional Incentives to Stay

Because of Mr. Brown's admirable military career, he is also desperate to clear his name—which he knows can only do by staying in the United States and coming to court. Many of Mr. Brown's close friends are in the military or are retired military. He is a member of numerous military-related social organization (Veterans of Foreign Wars, Command Barstool Association, Military Officers Association of America, the VA). Mr. Brown's military friends all know about this case. Counsel, from speaking with Mr. Brown's friends in preparation for this hearing[4], knows

---

[2] The government, for some reason, decides to spill ink on the idea that Mr. Brown lied when he said he bought a Mazda Miata for his daughter because he did not immediately give it to her. In reality, he did not give it to her because she is not yet 16. He still hopes to give it to get when she is the appropriate age and after teaching her to drive. This plan may be aspirational, but it does not make his statement that he bought the car for her false.

[3] The government claims Mr. Brown is making renovations to his home in order to sell it. This is not true. His home is custom built for his height—with extra-tall counters that diminish its resell value, not increase it.

[4] Many of those conversations were conducted by undersigned counsel's colleagues.

that his friends' group chats have been lit up with discussions about the government's overwrought and salacious allegations in this case. These allegations have fundamentally damaged Mr. Brown's reputation with his peers, and he has every incentive to stay and prove that he is not guilty or he will permanently lose lifelong friends.

    3.  *Mr. Brown's Ties to China*

To begin with, ties to foreign countries do not mean someone is a serious flight risk, as this Court's case law makes clear. In *United States v. Nwokoro*, 651 F.3d 108 (D.C Cir. 2011), the D.C. Circuit reversed a district court's order of a pretrial detention for failure to make adequate factual findings about the defendant's risk of flight. *See id.* at 110. It did so notwithstanding the fact that the defendant was a homeless, dual Nigerian citizen and had ties to the country of Nigeria. *Id.* at 110-11. In reversing the district court's order, the Court emphasized that the defendant had given up his passports (Mr. Brown's passport was also seized). *Id.* at 110. It was unconvinced that the defendant was necessarily a flight risk, even though he did not have any friends or family willing to post bond for him or have him live with them in the area. *Id.* at 111. Mr. Brown, as noted, has sisters who are desperate to have him live with them.

There are also numerous examples of other defendants in this jurisdiction with substantial foreign ties who have been released pretrial in recent years. Take, for example, the case of Roy George Varkey, 19-cr-425 (DLF). He was charged with bribing public officials on base in Kuwait, was a citizen of Kuwait with no real ties to United States, and was nevertheless permitted to live in Philadelphia with a friend. *See* 19-cr-425 (DLF), Dkts. 13, 27.

Also take the case of Asim Naqvi and Muzzamil Zaidi, 20-cr-181 (CRC). They were charged with violating the International Emergency Economic Powers Act (IEEPA) by acting as Iranian agents within the United States. Both men had strong family ties to Pakistan, and

Muzzamil had lived in Iran for the prior six years with only intermittent travel back to the United States.  *See* 20-cr-181 (CRC), Dkt. 7.  Both were released on home detention.

Or take the case of Jeffrey Nader, 24-cr-357 (JMC).  Mr. Nader was also charged with IEEPA violations, the contents of which are under seal and the Court can review.  Mr. Nader was permitted to live in Los Angeles with his wife, who is Iranian.

Or take the sealed case, 24-cr-63 (JMC), which too involves foreign contacts that the Court can itself review.

 Mr. Brown's case is easier than all of them.  He is American citizen and a veteran. Contrary to the Government's claims, he has no interest in returning to China—or anywhere else in Asia for that matter. His departure from China was, to put it mildly, acrimonious.  He was fired from his job in China—which the government dramatically misconstrues.   In fact, his time there ended so badly that he fears for his life upon his return.  He has had more than his fill of China.  There is simply no risk he will return there or anywhere else in Asia where the people he worked for might chose to come after him.

4.  *Nature and Circumstances of the Offense*

The government claims that Mr. Brown is facing 6-8 years in prison based on its own Guidelines calculation.  That is a stretch.  The government claims that Mr. Brown's base offense level is 26 under U.S.S.G. § 2M5.2(a)(1).  However, respectfully, defense counsel believes the proper offense level is 14 because this offense does not, as alleged, involve the exportation of military weapons at all.

In addition, defense counsel is not convinced that the "special skill" enhancement pursuant to U.S.S.G § 3B1.3 is warranted even under the government's theory of the case.  Inherent in the sharing of defense security information is the fact that the defendant has had specialized training

to know that information.  The imposition of a two-level enhancement, in other words, would effectively double count Mr. Brown's liability.  It either should not apply at all or this double counting would support a downward variance.

Accounting for this difference in calculation, and the application of the zero-point offender reduction, Mr. Brown's Guidelines range would be 10-16 months.  With acceptance of responsibility, it would be 6-12 months, and the Guidelines would recommend that he receive a sentence of probation.  *See* U.S.S.G. § 5C1.1., Appl. Note 9 (explaining that a sentence other than a sentence of imprisonment is "generally appropriate" if the defendant received a zero-point offender adjustment and falls into Zone A or B of the Sentencing Table).  The government is simply wrong that Mr. Brown is likely to receive a lengthy prison sentence of 6-8 years.

In any event, even if the government were right about the long Guidelines range, that would provide *more* incentive for Mr. Brown to comply with his conditions on release, not less.  With a high sentencing range like that, Mr. Brown would want to ask for a variance, something that he would never receive if he were to attempt to flee.

### 5.  *The Weight of the Evidence*

The government claims that the weight of the evidence against Mr. Brown is strong.  But the weight of the evidence is the "least important factor and rarely favors the defendant at this stage." *United States v. Mario Mares*, 1:23-CR-252(ACR) (Memorandum Opinion at 5).  As is so often the case, it does not make strategic sense for the defense to reveal its theory of defense at this early juncture.  However, Mr. Brown staunchly denies the allegations in the government's complaint and maintains his innocence.

6. *The Government's More Bizarre and Irrelevant Allegations*

The defense need not and will not address every allegation and statement in the government's 23-page motion for detention. But several deserve discussion.

First, the government emphasizes that they seized a novelty passport and imitation cash from Mr. Brown's apartment. Neither demonstrates that he is a flight risk. The novelty passport obviously is not real. It says at the bottom "FAKE<ID<GENERATOR<FOR<ANDROID." It does not show Mr. Brown in any way had the intention to flee under an assumed identity or the capability of doing so.

In addition, the imitation cash, as the government admits, is not counterfeit. Nor is it part of some escape plan. Burning imitation paper money[5] is a part of several Chinese holidays, including a holiday known as Tomb Sweeping Day. The presence of such imitation cash is not a sign of anything untoward.

The government also emphasizes that Mr. Brown was trained on survival skills when he was in the military in the 1980s. At the time, Mr. Brown was in his 20s. Mr. Brown is now 65. To the extent he remembers this training at all, it is irrelevant. He is not going to flee to live in the woods or become a survivalist in his mid-sixties. Not only does he have no desire to do so, but he suffers from numerous medical conditions that would doing so impossible. As the pretrial services report reflects, Mr. Brown suffers from diverticulitis, an aneurysm over his heart, hypertension, gout, a scar on his right arm, surgery on his left arm, and difficulty with vision and hearing.

Indeed, counsel has seen some of this first-hand. Even a brief conversation with Mr. Brown reveals he has difficulty hearing. Counsel has had to repeat herself numerous times in Court and

---

[5] It is commonly referred to as "joss paper" or "hell money." *See* Hell Money, https://en.wikipedia.org/wiki/Hell_money.

in their meetings.  Mr. Brown also has clear difficulty seeing, and after the first court hearing mentioned that the Court looked like a "blob" on the bench.  He also has had numerous broken bones and has metal in both his right and left arms that make even holding cards at Northern Neck difficult.

On this topic, one of the consistent undertones in the government's motion is that Mr. Brown is a trained pilot and that this increases his flight risk.  Pun aside, it does not.  Mr. Brown lost his pilots license in recent years because of his numerous health conditions.[6]  His poor eyesight, poor hearing, lack of mobility, and a host of conditions mean he cannot get behind the steering wheel of a plane ever again.  Mr. Brown's pilot training, which he cannot use these days, does not increase his flight risk.

The government also acts as if Mr. Brown's purchase of a Mazda Miata is somehow inculpatory.  The fact that, while under surveillance, the most inculpatory thing the government can come up with is the fact that Mr. Brown rented a car to drive to another state to purchase a different car and drive home is telling.  Contrary to the government's claim, this illustrates that Mr. Brown is not a flight risk.  There is nothing suspicious about going into a bank and leaving with an envelope when someone is about to purchase a vehicle in cash.  That is exactly what one would expect, is entirely lawful, and—in reality—shows an intention to stay in the United States. People do not generally drive across the country to buy a car when they are planning to move to another continent.

The government also alleges that, while they were surveilling Mr. Brown, he drove as if he was being surveilled.  In reality, Mr. Brown was driving an unfamiliar car in an unfamiliar part of the country (during his purchase of the new vehicle) and made several wrong turns.  He did not

---

[6] He also had an infraction that caused him to lose his FAA credentials.

try to avoid surveillance, even though it would have made sense for him to do so since he was, in fact, being surveilled.

Even if the government were right that Mr. Brown knew he was being surveilled, however, that would not help them. Instead, it would only underscore that he is not a flight risk, because he remained in the United States after knowing he was being surveilled and did not, as the government alleges he would, leave the country.

Finally, the government has posited a farfetched hypothetical that involves Mr. Brown fleeing to a Chinese embassy or consulate within the United States and then somehow being driven out of the United States in an embassy vehicle. As noted, Mr. Brown fears for his safety in China and will never return. This hypothetical is, therefore, irrelevant.

In any event, the government's hypothetical is entirely unbelievable. First and foremost, there is zero chance the Chinese government would invite such a dramatic international incident, which would fundamentally damage China's relationship with the United States. In addition, defense counsel simply does not believe that the U.S. government would let a consulate vehicle with an American pilot they believed to be a traitor drive out of the country without interference. The government's suggestion to the contrary is unpersuasive in the extreme. And that does not even address the fact that Canada and Mexico are not going to let a fleeing accused felon and traitor into their country as part of some dramatic flight in a Chinese consulate vehicle. Again, the damage to their relationship with the United States would be profound, and there is zero chance they would be willing to take that risk to hurt their own ally (the U.S.) and aid a geopolitical adversary (China).

11

Finally, one cannot simply drive to China from the United States.  It is on a different continent.  Even if Mr. Brown were to somehow miraculously cross into Canada or Mexico, that would not get him to China.  Nothing about the government's hypothetical makes sense.

   7.   *The Court's Release Options*

In order to hold Mr. Brown pre-trial, the Court must conclude that there is no combination of conditions that will ensure his appearance in Court.  The Court has multiple options for release.  Mr. Brown's primary request is that the Court follow probation's recommendation and release Mr. Brown to his residence in Indiana and to turn over his passport (which is already in the government's custody).  As this Court knows, pretrial does not recommend release without a third party custodian often, and their expertise should be given weight.  Furthermore, Mr. Brown does not oppose the Court recommending that he be added to the "No Fly" list, if he has not been added already, nor is he opposed to being forbidden to contact any consulate or embassy, including the Chinese embassy.

If the Court requires additional assurance, he also proposes that he be placed on home confinement in Indiana with GPS monitoring.  Although not perfect, GPS monitoring is known to dramatically reduce flight risk.  Monitoring will ensure the government knows if Mr. Brown has left his residence.  Were Mr. Brown to cut his ankle monitor as part of an effort to flee (something, to be clear, he will not do), pretrial services would receive an immediate alert.

If the Court does not find that assurance sufficient either, Mr. Brown requests that he be permitted to live with his sister Terri Brown at her home in Minnesota, on home confinement if necessary.  Ms. Brown is an accountant nearing retirement.  She largely spends her time at home, and has a part time, two-day-a-week accounting job.  She is willing and happy to have her brother

live with her during this difficult time and has assured counsel, in no uncertain terms, that she will report on her brother if he violates any of the Court's rules.

Having Mr. Brown live there would provide substantial additional assurance to the Court. For one, he would be monitored by his sister. For another, if he were to flee, that would be a direct betrayal of his sister who has agreed to take on the burden and responsibility of living with him. He is very grateful for his sister's support and would never jeopardize his relationship with her by leaving.

Finally, defense counsel also notes that Mr. Brown's other sister, Mrs. Champlin, has offered to have Mr. Brown live with her. Mrs. Champlin's husband is hesitant to have Mr. Brown in his home full time. However, Mrs. Champlin has generously offered to rent an apartment and move in with her brother there in order to ensure that he has a place to stay with a third-party custodian if that is what the court requires. Given that Ms. Brown is also willing to take her brother in, and that presents fewer logistical hurdles, that appears to be the best option. However, it is notable and admirable the lengths Mrs. Champlin is willing to go for her brother. And, if the court were to prefer to have Mr. Brown live with Mrs. Champlin, that is also an option.

## Conclusion

For the reasons stated above, Mr. Brown should be released on his personal recognizance, on the conditions that he live at his address in Indiana, turn over his passport, and not leave the country or contact any consulate or embassy.  If the Court requires additional assurance, Mr. Brown also proposes he be held on home confinement or released to the custody of his sister as a third-party custodian.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

COURTNEY L. MILLIAN
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C.  20004
(202) 208-7500

14